UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
KRYSTAL SANTIAGO and SCARLETT OSORIO,
individually and on behalf of similarly situated female
employees,

                        Plaintiffs,

                -v-

INFORMATION RESOURCES INC.,
and JEFF NEUMAN

                        Defendants.
------------------------------------------------------------------X

Case Number: 20-cv-07688-AT

**FIRST AMENDED COMPLAINT WITH JURY DEMAND**

Plaintiffs, Krystal Santiago ("Ms. Santiago") and Scarlett Osorio ("Ms. Osorio") (collectively Plaintiffs or Named Plaintiffs) by and through their attorneys, the Law Offices of William Cafaro, bring this action against Information Resources Inc. ("IRI" or the "Company"), and Jeff Neuman, an IRI Principal ("Neuman"), in their individual capacities and on behalf of a collective of female exempt consultants, including, but not limited to, female analysts, consultants, principals, vice presidents, and senior vice presidents (collectively "Professionals") to redress severe gender and race discrimination in employment. Plaintiffs allege upon knowledge to themselves and their own actions and upon information and belief as to all other matters as follows:

## PRELIMINARY STATEMENT AND SUMMARY OF CLAIMS

1.      As one of the original innovators in big data, IRI is part of an elite cadre of professional services firms that influence industry standards and practices. But rather than use its vast resources to stamp out gender discrimination, IRI actively perpetuates it.

2.      Women are conspicuously absent from IRI's leadership.  Among the 10 members of IRI's executive team, only one, IRI's Chief Legal Officer, is female.  Similarly, of the ten members of the board of directors, none, or 0% are female.

3.      IRI's gender hierarchy is all the more jarring considering women have entered into the consulting industry in record numbers for decades.

4.      As an employee of IRI, women and other minorities, fare far worse than the industry average.

5.      The above makes it clear that while white male, female, or people of color ("POC") may begin their careers on roughly equal flooring, their paths sharply diverge as they ascend up the hierarchy, particularly at IRI.

6.      At IRI, discrimination is not always so subtle.  High performing female managers are viewed as interlopers by their male managers, as threats by their male peers, and as individuals unworthy of respect by their male subordinates.  As soon as these women come within reach of management, they are suddenly - without warning or provocation - chastised and removed from the promotion track before they can infiltrate IRI's "good old boys" network.  By contrast, male employees who "have an issue working with women" (including the individual defendant herein) effortlessly ascend through the ranks at IRI.

7.      In the aftermath of the racist murder of George Floyd, Defendants began a discussion about initiatives to allow employees to talk about their feelings concerning IRI and the inherent sexism and racism of the company.

8.      It is no surprise that Defendants would announce these initiatives during a moment which has been described as "a turning point in race relations."  These measures would appear, on

their face, to be genuine efforts to talk about diversity and inclusion at IRI but they fail to put into practice any substantive measures to help promote women, or POCs.

9.      Unfortunately, time and time again, IRI has utterly failed when it has had to actually look itself in the mirror and decide whether it wants to truly address its deep-seated, racially unjust policies that have resulted in alarmingly low and disproportionate numbers of female and POCs amongst its ranks, and in particular, its executive ranks. Rather than seriously examine its own role in perpetuating inequalities in hiring, pay and promotion, and in fostering toxic workplace cultures, IRI has instead repeatedly stopped short of any meaningful major overhauls during this opportunity for change.

10.     Most troubling, IRI has, in true hypocritical fashion, actively sought to *silence* those who speak out and try to advocate for change when it comes to diversity and inclusion.

11.     Moreover, the issues detailed in this complaint are widespread and endemic of high-level management.  In fact, during a global town hall earlier this year, an anonymous employee posted the following:

> What about HR support for Countries that don't have any local HR? I already reached out to a USA assigned HR contact to complaint for *psychological harassment* and everything was done to protect the perpetrator - it made me feel so terrible about it that I don't even want to reach out to that person anymore for any other matters...

(emphasis added)

12.     Also, going as far back as 2018, there have been complaints about IRI's racist behavior. In one telling post an anonymous person on Glassdoor.com stated that HR lied about employees, stating that there were racist undertones at the Company, and that there was hardly any diversity.



13.     Another anonymous former group leader in May 2020 stated that IRI was "male dominated," a place where "women are marginalized" and women have "limited career opportunities."



14.     In July 2020, an anonymous former account executive stated that IRI management and the level right below management *were biased* and that she was terminated, due in part, because she was a single parent who had to take care of her children.



15.     Moreover, as late of August 2020, on a call which HR Manager, Mallory Smith participated, it was admitted that IRI was still in its nascent stage of combatting discrimination and is being "reactive" instead of being "proactive" in regards to diversity and inclusion.

16.     On that same call referenced above, an IRI Vice President acknowledged the lack of diversity on IRI's Board of Directors and blamed this lack of diversity on private equity ownership.  He also acknowledged that IRI had "a long way to go" in terms of diversity and inclusion.

17.   Plaintiff Krystal Santiago was one such victim of IRI. She paid the ultimate price by losing her job merely because she pushed too hard for reforms that would disrupt the status quo of ***white male dominance***.

18.   For over a year, Ms. Santiago, a Client Insights Consultant, raised her voice about the irrefutable and appalling patterns she saw regarding the hiring, retention, and lack of advancement for women and POCs detailed in this complaint.

19.   Plaintiff Scarlett Osorio was another such victim of IRI. Ms. Osorio, a Client Insights Consultant, continues to raise her voice about the irrefutable and appalling patterns she saw regarding the hiring, retention and lack of advancement for women and POCs detailed in this complaint, even though it has painted a target on her back.

20.   While Defendants are quick to now pay lip service to the diversity problem at IRI because they are suddenly moved, they have refused to try to make any real change in the organization. In fact, during a global town hall in July 2020, IRI Chief Executive Officer, Andrew Appel, ***questioned whether diversity was even necessary*** at IRI. In fact, in that same global town hall, Mr. Appel stated that the only diversity that was necessary was diversity of thought.

21.   Upon information and belief, female employees were disproportionately and discriminatorily downgraded and undervalued within IRI's performance review system. This mistreatment is uniform throughout the Company.

22.   Upon information and belief, IRI's performance evaluation system's insufficient standards, quality controls and implementation metrics, coupled with its lack of transparency and opportunities for redress, has a discriminatory and disparate impact on female employees.

23.   IRI employees are promoted within a system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly develop and promote

excellent employees. Promotions are not based upon true comparative performance as they lack transparency and sufficient quality controls in their design and implementation.

24.     IRI's promotion procedures and practices reflect and codify the biases of the Company's mostly white male management and, naturally, have a disparate impact on the Company's female and POC employees. Even when ostensibly based on performance, managers have discretion to promote those within the "good old boys" club.  Participation in male-dominated social activities—such as after-work happy hours (where management routinely used slurs) are among the criteria that may be considered for evaluation, compensation and advancement at IRI.

25.     IRI was able to and systematically did derail the advancement of high performing female Professionals who were viewed as a threat, who were wrongly cast as less committed to their careers, or who the Company wanted to push out for other discriminatory reasons.

26.     The Company's promotion practices consistently result in males being promoted more rapidly and assigned more frequently to higher positions than women within and across levels Company-wide. Although IRI has had knowledge of these stark gender disparities for years, it has been deliberately indifferent to them.

27.     In fact, in July 2020, an anonymous current IRI analyst posted "the leading qualifier for growth is apparently how your bosses feel about you."  Moreover, this analyst further stated that he was told by HR that there are no set qualifications for promotions in the company and that it was up to the individual manager's subjective discretion to decide on promotions.



28.     Countless women have progressed along IRI's standard career track with rave reviews, only to find their career ambitions shattered by IRI's glass ceiling.

29.     Upon information and belief, IRI's female Professionals are not only underpromoted, but underpaid as well.  In that, Defendants routinely pay female Professionals between 5-10% less than their similarly situated male counterparts.

30.     Because IRI employs a compensation system that has insufficient quality standards, controls, and implementation metrics, and lacks transparency and opportunities for redress or challenge, its compensation practices have had a disparate impact on the Company's female employees.

31.     Upon information and belief, IRI management systematically took advantage of the flaws in the system by paying female employees less than similarly situated male employees.

32.     At IRI, salary increases and bonuses are based largely on a performance evaluation system that is insufficiently designed, articulated, explained or implemented to consistently, reliably or fairly compensate strong-performing employees. Upon information and belief, IRI's discriminatory performance evaluation system has resulted in the under-payment of female Professionals at all levels throughout the Company.

33.     In addition, the compensation system as a whole lacks the adequate quality standards and controls and implementation metrics to consistently or reliably result in compensation decisions that correlate with an employee's overall quality or contributions to the Company. The lack of transparency, sufficient opportunities, and systems for redress result in women being systematically undercompensated.

34.     Despite the Company's hollow promises and orchestrated "photo opportunities" through its actions taken against Plaintiffs, it is clear that diversity is the last thing IRI cares about. Nowhere is this truth clearer than in the facts underlying the Plaintiffs' claims.  Notwithstanding IRI's attempts to silence Plaintiffs, they intend to cast light on the bias that has caused harm to them and countless numbers of women and POC employees.

35.     It is clear that once the curtain is pulled aside and the deftly-crafted public messages are scrutinized, the truth is that IRI has, and has had, no interest whatsoever in disrupting the status quo that has kept power and control of the Company in the hands of White men.

36.     Rather than lead and be brave, IRI weakly continues to follow the herd.

## APPLICABLE LAWS

37.     Plaintiffs bring this action to redress the unlawful employment practices committed against them, including Defendants' discriminatory treatment towards them due to their gender and/or race, as well as unlawful retaliation due to their complaints of discrimination, in violation of Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Exec. Law §§ 290 et seq. ("NYSHRL") and the New York City Human Rights Law, N.Y. City Administrative Code §§ 8- 101 et seq. ("NYCHRL").

38.     Plaintiffs also bring this action individually and on behalf of a collective of female employees to redress IRI's discriminatory pay practices, in violation of the Equal Pay Act, 29 U.S.C. § 206 et seq. ("EPA") and the New York State Pay Equity Law, N.Y. Lab. Law § 193 et seq. ("New York Labor Law").

## JURISDICTION AND VENUE

39.     The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, as this action involves federal questions regarding the deprivation of Plaintiffs' rights under Section 1981, Title VII, and the EPA.  The Court has supplemental jurisdiction over Plaintiffs' related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

40.     Pursuant to 28 U.S.C. § 1391, venue is proper in this Court because Defendants operate substantial business in this district, a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

41.     Defendants clearly had sufficient minimum contacts with the State of New York to permit the exercise of long arm jurisdiction.

42.     The underlying controversy arises out of and related to the Defendants' contacts with the State of New York.

## ADMINISTRATIVE PROCEDURES

43.     Prior to filing this lawsuit, Plaintiffs filed separate charges of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC") against Defendants for its violations of Title VII of the Civil Rights Act of 1964.  Plaintiffs' submission will include facts supporting collective claims brought on behalf of female employees.

44.     Plaintiff Santiago received a notice of right to sue from the EEOC on or about May 7, 2021.

45.     Plaintiff Osorio received a notice of right to sue from the EEOC on or about May 10, 2021.

46.     This First Amended Complaint has been filed within 90 days of the Plaintiffs receiving their notices of right to sue from the EEOC.

47.     Plaintiffs served a copy of this first amended complaint upon the New York City Commission on Human Rights and the Corporation Counsel of the City of New York in accordance with N.Y.C. Admin. Code § 8-502(c).

48.     Any and all prerequisites to the filing of this suit have been met.

## PARTIES

49.     Ms. Santiago is a resident of the State of New York and resides in Queens County.

50.     Ms. Osorio is a resident of the State of New York and resides in Kings County.

51.     At all times herein pertinent, Ms. Santiago, was an "employee" of the Defendants, and each of them, within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

52.     At all times herein pertinent, Ms. Osorio, is an "employee" of the Defendants, and each of them, within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

53.     At all times herein pertinent, Ms. Santiago was and is a "person" within the meaning of Section 1981, Title VII, the NYSHRL, and the NYCHRL.

54.     At all times herein pertinent, Ms. Osorio was and is a "person" within the meaning of Section 1981, Title VII, the NYSHRL, and the NYCHRL.

55.     At all times herein pertinent, IRI was and is a foreign business corporation created under the laws of the State of Delaware.

56.     At all times herein pertinent, IRI's principal place of business is located at 150 North Clinton Street, Chicago, IL 60661.

57.     IRI maintained an office space located at 1250 Broadway, 36th Floor, New York, NY 10001.

58.     At all times herein pertinent, IRI was duly authorized by the Secretary of State to transact business in the State of New York.

59.     The principal situs of the work Plaintiffs did was centered in the City, State and County of New York.

60.     Plaintiffs, and each of them, were frequently required to work out of the office located in New York, NY.

61.     The vast majority of the customers and potential customers Plaintiffs worked with were located within the City of New York.

62.     At all times herein pertinent, Defendant IRI was an employer of Ms. Santiago within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

63.     At all times herein pertinent, Defendant IRI was an employer of Ms. Osorio within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

64.     At all times herein pertinent, IRI had fifteen (15) or more persons in its employ at all times relevant.

65.     At all times herein pertinent, IRI had four (4) or more persons in its employ at all times relevant.

66.     At all times herein pertinent, Defendant Neuman was a resident of the State of New York.

67.     At all times herein pertinent, Defendant Neuman as a Principal/Vice President of IRI had the authority to hire, fire, discipline, supervise, and direct the Plaintiffs, and administer the terms, conditions and privileges of their employment.

68.     Defendant Neuman was an employer of Ms. Santiago within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

69.     Defendant Neuman was and is an employer of Ms. Osorio within the meaning of Section 1981, Title VII, the EPA, the NYLL, the NYSHRL, and the NYCHRL.

70.     Upon information and belief, Defendant Neuman has, and at all times herein pertinent, had his actual place of business at 1250 Broadway, 36th Floor, New York, NY 10001.

71.     As stated in more detail below, Defendant Neuman actually participated in the conduct giving rise to the claims of discrimination alleged herein and is liable as an aider and abettor of unlawful conduct.

72.     Upon information and belief, for the calendar year 2017 the gross receipts of IRI were not less than $500,000.00.

73.     Upon information and belief, for the calendar year 2018 the gross receipts of IRI were not less than $500,000.00.

74.     Upon information and belief, for the calendar year 2019 the gross receipts of IRI were not less than $500,000.00.

75.     Upon information and belief, for the calendar year 2020 the gross receipts of IRI were not less than $500,000.00.

76.     Upon information and belief, for the calendar year 2021 the gross receipts of IRI will not be less than $500,000.00.

77.     At all times herein pertinent, the Defendants, and each of them, were engaged in an industry having an effect on commerce within the meaning of 29 U.S.C. § 203.

78.     At all times herein pertinent, and in the course of his duties, Plaintiffs regularly handled products which had been moved in commerce, including, but not limited to, computers, laptops, keyboards, computer mice, and monitors.

## FACTUAL ALLEGATIONS

79.     There is no question that historically and through to the present, white men run IRI.

80.     Plaintiff Santiago suffered discrimination in pay, denial of promotional opportunities, discrimination as a result of race/gender, and a hostile work environment.  She was ultimately discharged on or about March 4, 2020.

81.     Moreover, Defendants failed to abide by their own code of conduct when terminating Ms. Santiago in that she was not given a written or verbal warning before her termination.

82.     Plaintiff Osorio suffered discrimination in pay, denial of promotional opportunities, discrimination as a result of race/gender, and a hostile work environment.  She continues to work for IRI.

83.     In March 2018, Ms. Santiago began working for IRI as a Client Insights Consultant.  She had previously earned her Bachelor of Arts in English Language and Literature with a minor in Psychology from Wellesley College in 2010.

84.     In October 2019, Ms. Osorio began working for IRI as a Client Insights Consultant.  She had previously earned her Bachelor of Science in Managerial Economics with concentrations in Accounting, Media Arts & Society from Bentley University in 2013.

85.     Like all other Client Insights Consultants at IRI, Plaintiffs' primary job duties included, but were not limited to, providing analytical solutions and business insights to IRI's clients, to ask questions to test assumptions of the status quo, synthesize information on a variety of issues and translate the information to provide solutions to IRI's clients.

86.     Upon information and belief, the only educational requirements to be a Client Insights Consultant at IRI is a Bachelor's degree.

87.     For promotions from entry-level Consultants, IRI uses a standard career progression track which advances employees on a schedule.

88.     Throughout her employment with IRI, until the issues complained of in this action, Ms. Santiago demonstrated stellar performance at IRI.

89.     Throughout her employment with IRI, until the issues complained of in this action, Ms. Osorio demonstrated stellar performance at IRI.

90.     Upon information and belief, IRI paid Ms. Santiago less than similarly situated male employees despite her exemplary performance; she was paid at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

91.     Upon information and belief, IRI paid Ms. Osorio less than similarly situated male employees despite her exemplary performance; she was paid at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

92.     For example, Ms. Santiago's direct replacements, a white male named Adam Swift and a white man named Robert Soucy, upon their hire, upon information and belief were paid approximately *ten percent* more than Ms. Santiago.

93.     Upon information and belief, not only did Ms. Santiago's direct replacements do the exact same job as Ms. Santiago, they also serviced the exact same client as Ms. Santiago, Anheuser Busch.

94.     As Ms. Santiago's direct replacement both Mr. Swift and Mr. Soucy performed the same tasks as Ms. Santiago, and upon information and belief, did so with no greater skill or effort than Ms. Santiago, achieving a substantially equivalent level of performance.

95.     Moreover, upon information and belief, Ms. Santiago had more relevant experience and a longer tenure than her Ms. Soucy or Mr. Swift and was still paid approximately 10% less than these two white males.

96.     For another example, and upon information and belief, Ms. Osorio is paid between 5-10% less than the white male members of her team, including as compared to Ms. Soucy and Mr. Swift.  These men perform the same tasks as Ms. Osorio, and upon information and belief, do so with no greater skill or effort than Ms. Osorio, achieving a substantially equivalent level of performance.

97.     After Defendants' discriminatory termination of Ms. Santiago, her work fell upon Ms. Osorio as Defendant Neuman either refused or was unable to do the work.

98.     As she understood the role, Ms. Osorio was required to onboard and train Ms. Santiago's replacements.

99.     Upon information and belief, Ms. Osorio, Mr. Swift, and Mr. Soucy do the exact same work (outlined above) for the exact same client (Anheuser Busch).  Despite this, upon information and belief, both Mr. Swift and Mr. Soucy are paid 5-10% more than Ms. Osorio.

100.    IRI has cited no business justification for the substantial pay increase for Ms. Santiago's replacements, Mr. Soucy or Mr. Swift.

101.    Moreover, another comparator would be a former male employee named Jaison Joseph.  Mr. Joseph again did the exact same work as Ms. Osorio and Ms. Santiago and worked with the Plaintiffs on the same account (again Anheuser Busch).  Despite this, upon information and belief, Mr. Joseph was paid approximately ten percent more than the Plaintiffs.

102.    Upon information and belief, Ms. Santiago, Ms. Osorio, Mr. Joseph, Mr. Soucey, and Mr. Swift are all Client Insights Consultants at IRI, performed the same job duties (provided

above), for the same client (Anheuser Busch) yet, the Plaintiffs were paid approximately ten percent less than these male co-workers.

103.    Upon information and belief, Ms. Santiago and Ms. Osorio are not the only women to suffer the effects of the compensation policies and practices at IRI, which lacked sufficient standards and quality controls, transparency, implementation metrics, and opportunities for redress that would otherwise have ensured there was no disparate impact on female professionals.

104.    Upon information and belief, IRI management systematically took advantage of the flaws in the system by paying female employees less than similarly situated male employees. IRI underpays female Professionals at all levels throughout the Company relative to similarly situated male employees.

105.    For example, and upon information and belief, a female POC client insights principal who was the same level as Defendant Neuman was paid approximately *ten percent less* than Defendant Neuman.  This client insights principal was paid at a lower rate than men for equal work on jobs requiring equal skill, effort, and responsibility, and which were performed under similar working conditions.

106.    In fact, in or around January 2020, Ms. Santiago had a conversation with one of IRI's Client Insights Principals on the 9th floor of 125 West 24th Street, New York, NY 10011 (the "Client Site")

107.    During this conversation, this Client Insights Principal explained that part of her job was to review IRI's revenues for projects so that they could be expanded.  In that role, she explained that she had access to IRI's payroll data.  She further explained that she had reviewed IRI's payroll data for the last several years and noticed that she and other female Consultants were paid considerably less than their male counterparts.  Specifically, she told Ms. Santiago that, on

average, IRI paid female Consultants **ten percent** less than their similarly situated male counterparts.

108.   Because IRI employs a compensation system that has insufficient quality standards and controls, and implementation metrics, and lacks transparency and opportunities for redress or challenge, its compensation practices have had a disparate impact on the Company's female employees.

109.   In fact, since Defendant Neuman began his employment with IRI, he has systematically removed women from his team and replaced them with white males.  For example, when Mr. Neuman first took over a team in March 2018, it was 100% diverse, with all team members being women and/or POCs.  A short time later, the team is now two thirds white males.

110.   The above is also true concerning Mr. Golden. Teams that were majority women and/or POC were systematically targeted and reassembled to represent the "old boys club," and majority white male.

111.   Moreover, once Defendant Neuman took over a team, in order to accomplish his goal of creating an old boys club for white males, he systematically discriminated against the POC and female employees, forcing many to resign or request transfers away from Defendant Neuman.

112.   Throughout their employment with IRI, Plaintiffs suffered increasing harassment and unequal treatment at IRI.

113.   Throughout their employment with IRI, Defendant Neuman would increase the workload on women and POCs while systematically lowering the workload on the white males of his team.

114.   Moreover, Defendants would subject Plaintiffs to increasingly biased behavior, including, but not limited to:

a)   Continuously asking Plaintiffs where they were really from, implying that they must have been born abroad;

b)   Refusing to believe that either Plaintiff grew up in an affluent part of New York;

c)   Stating that the Plaintiffs were a credit to their race;

d)   Calling the Plaintiffs "articulate;"

e)   Calling the Plaintiffs "hot-blooded;"

f)   Routinely using their hosting privileges to mute Plaintiffs, women, and POCs while they were speaking on a video conference call;

g)   Routinely interrupting Plaintiffs, women, and POCs while they were speaking;

h)   Routinely interrupting Plaintiffs while they are presenting at meetings;

i)   Routinely calling Plaintiffs "too sensitive;" and

j)   Questioning whether Plaintiffs had families to go home to for dinner.

115.   In one telling example of the blatant discrimination at IRI, in December 2019, Senior Vice President Brad Golden ("Golden") referred to a homosexual member of the team as a "faggot."  Shortly thereafter the gay team member left IRI.

116.   Moreover, Defendants subjected Plaintiffs and other women and POCs to differing standards.  For example, female managers are expected to do the work of multiple men and understand the underlying systems so that they can do the work of their subordinates should the need arise.  However, male managers are not subjected to these high standards and are allowed to not learn the underlying systems and give their work to female subordinates.

117.   Moreover, when Plaintiffs complained to the individual Defendants about their unequal treatment, these Defendants tried to placate their concerns with gifts.  For example, after

Ms. Santiago complained about her increased workload due to Defendant Neuman's failure to learn their system well enough to pull reports, Defendant Neuman gave Ms. Santiago a pink bag which said "Babe."

118.    Similarly, when Ms. Osorio complained to Defendant Neuman about her increased workload, he gave her a baseball cap with the word "Rubia" imprinted on the front.  The term "Rubia" means blonde in Spanish. Throughout her tenure with IRI, Ms. Osorio has not had blonde hair.

119.    Upon information and belief, while Human Resources policies and procedures exist at IRI, they lack meaningful quality controls, standards, implementation metrics, and means of redress. Concerns about discrimination made to supervising staff and HR itself are allowed to go unaddressed, or worse, to result in further or increased discrimination and retaliation.

120.    After Plaintiffs complained about their unequal treatment, they were both retaliated against.

121.    After Defendant Neuman was hired, he refused to do necessary training that would make him an effective manager. Specifically, Defendant Neuman refused to properly train on a program called Unify, a database solution that IRI and its customers rely on to assess product sales performance.  When called on to do this training he would arrive very late, spend the time looking at his mobile phone, and roll his eyes at the female instructor.  Rather than learn this application, Defendant Neuman would require his female subordinates to do his work for him, substantially increasing their workload.

122.    In January 2020, Ms. Santiago complained about her increased workload and that Defendant Neuman was pushing his workload onto women and POCs because of their minority status.  She further complained that women and POCs were being treated differently in that

Defendant Neuman was allowed to disregard a large portion of his job duties onto others while women and POCs were required to complete all of their job duties.  In response, Defendant Neuman explained that he could not be sexist since he has a daughter and two sisters.

123.    After the exchange above, Ms. Santiago continued to address the discrimination she was experiencing that is detailed above.  In all, Ms. Santiago complained about Defendant Neuman's discriminatory behavior approximately 8-10 times before her termination.  Specifically, between January 2020 and her termination on or about March 4, 2020, Ms. Santiago complained to Defendant Neuman, Mr. Golden and other Client Insights Principals about Defendants' discriminatory workload and pay, stating that she believed she was being discriminated against because of her sex and because she was Hispanic.  She further complained about the hostile work environment she was subjected to.

124.    On or about March 4, 2020, Ms. Santiago was called into a meeting which she was led to believe was to discuss revenue opportunities (which was the subject of her calendar invitation to the meeting).  When Ms. Santiago walked into the meeting, she was greeted by Defendant Neuman and Mr. Golden with IRI's Busines Partner VP, Nancy Bucher on the phone.  Ms. Bucher informed Ms. Santiago that she was being terminated.  When Ms. Santiago asked for a reason why she was being terminated, both Ms. Bucher and Golden stated that it was due, in part, to Ms. Santiago's 2018 performance review.  This shocked Ms. Santiago as she was rated as a "Key Performer" on her 2018 performance review.

125.    Upon information and belief, Defendants gave differing accounts of Ms. Santiago's termination to different people. For example, Defendants told Ms. Santiago's former team members that Ms. Santiago was terminated for misconduct, while they told former clients Ms. Santiago was on vacation or requested to be moved to another team.

126.    Prior to her termination, and upon information and belief, against IRI corporate policies, Defendants did not give Ms. Santiago an oral or written warning prior to termination.

127.    Prior to her termination, and upon information and belief, against IRI corporate policies, Defendants did not give Ms. Santiago a performance improvement plan before her termination.

128.    Ms. Santiago was terminated for complaining of Defendants' discriminatory conduct.

129.    After Ms. Santiago's termination, Defendants set their sights on Ms. Osorio, continuing to subject her to unequal treatment in the hopes that she would quit so that she can be replaced with a white male.

130.    On or about March 5, 2020, Defendant Neuman met with Ms. Osorio to explain that he has no concerns with her performance and stated that Ms. Osorio will now have an increased workload.

131.    Later that same day, Ms. Osorio had a 90-minute meeting with Golden to discuss Ms. Santiago's departure.  During that meeting, Ms. Osorio complained about Defendant Neuman's discriminatory workload distribution and lack of support.

132.    Later in March 2020, Defendant Neuman, still refusing to learn how to use the Unify database application, asked Ms. Osorio to begin sending Unify requests to other IRI teams.  This has a negative impact on various IRI team operations, causes a slowdown in operations, and hurts IRI clients.

133.    Upon information and belief, Defendant Neuman has never been reprimanded for his failure to learn how to use this application, and was thus treated more favorably than similarly

situated female POCs at the same level who are required to learn and use Unify when their teams were overworked.

134.    On or about April 16, 2020, Ms. Osorio had a year-end discussion with Defendant Neuman via telephone.  During this conversation, Defendant Neuman reiterated that Ms. Osorio's workload would be increased and added more responsibilities and complexity to Ms. Osorio's workload.

135.    The conversation then shifted towards Ms. Osorio's performance.  Defendant Neuman stated that he would rate Ms. Osorio as a "Key Performer" however, due to IRI policy, he would have to rate her as a "New Hire" since she was hired in October 2019.  The next day, Ms. Osorio submitted a signed performance scorecard, with the rating of "New Hire."

136.    On or about April 21, 2020, Ms. Osorio spoke to HR about Defendant Neuman's discriminatory conduct and her personal career development.  During this meeting, Ms. Osorio complained that Defendant Neuman was discriminating against women and minorities by failing to provide support to women and minorities and was increasing the workload on women and minorities (including herself).   She further told HR that she felt that she was being discriminated against because of her gender and/or race.

137.    The next day, Defendant Neuman informed Ms. Osorio that he is aware of her complaints to HR and that he has ongoing connections with IRI's HR.

138.    On or about April 26, 2020, *less than one week*, after Ms. Osorio complained about Defendant Neuman, she received an email stating that her performance was no longer "New Hire" or "Key Performer" but had been downgraded to "Needs Improvement."

139.    When speaking to HR about the issue, Ms. Osorio was informed that the new performance metrics do not allow for a "New Hire" designation, and that ***all*** new hires, pursuant to corporate policy, received the "Needs Improvement" designation.

140.    However, on April 29, 2020, when speaking with Golden about the issue, Ms. Osorio was told that she was rated as a "New Hire" and ***not*** "Needs Improvement."

141.    On May 1, 2020, Ms. Osorio had another meeting with HR on her performance issue.  During this meeting, HR informed Ms. Osorio that it was not a written policy that required new hires to get the "Needs Improvement" designation but was "sort of an undocumented practice and philosophy."

142.    Upon information and belief, similarly situated male new hires did not receive the "Needs Improvement" designation and/or did not have their performance changed from "New Hire" to "Needs Improvement."

143.    Upon information and belief, Defendant Neuman was not reprimanded for changing Ms. Osorio's performance review.

144.    Ms. Osorio's performance review was changed for complaining of Defendants' discriminatory conduct.

145.    As a further act of discrimination against the Plaintiffs, the Defendants failed to timely investigate the Plaintiffs' claims, instead waiting several months to initiate an investigation after they received notice of Plaintiffs' discrimination claims.

146.    Plaintiff Santiago was terminated due to her race and/or gender.

147.    Defendants treated members outside of Plaintiffs' race and/or gender more favorably by not subjecting them to the discriminatory conduct outlined above.

148.    Upon information and belief Plaintiff Santiago was replaced by a white male.  Specifically, and upon information and belief, Plaintiff Santiago was replaced by a white male named Adam Swift.

149.    Defendants have treated Plaintiffs unequally, and less well than other employees because of their race and/or gender in violation of the NYSHRL.

150.    Employees outside Plaintiffs' protected class(es) have and continue to be treated more favorably than Plaintiffs.

151.    Upon information and belief, Defendants disciplined and terminated its POC and/or female employees far more often than its white male employees.

152.    Plaintiffs were unlawfully discriminated against, on the basis of race and/or gender in violation of the NYCHRL.

153.    Plaintiffs were treated less well than similarly situated employees in violation of the NYCHRL.

154.    Defendants retaliated against Plaintiffs due to the complaints they made to Defendants regarding her discriminatory treatment.


## COLLECTIVE ACTION ALLEGATIONS


155.    Plaintiffs' Cause of Action under the Equal Pay Act is being prosecuted as a collective action pursuant to the Equal Pay Act, 29 U.S.C. §206 *et seq*.

156.    Plaintiffs incorporate by reference the allegations from the preceding paragraphs, including those alleging common patterns, practices, and/or policies by IRI resulting in unlawful discrimination, as fully set forth herein.

157.    Plaintiffs allege claims under the Equal Pay Act on both an individual basis and on behalf of a collective of female employees, including women of color, who have been, are now or will be employed by IRI in New York at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "EPA Collective"). This Collective, upon information and belief, consists of more than 25 women.

158.    The discriminatory employment practices that disproportionately affect female employees and cause them to be paid less than similarly situated men at IRI exist in connection with subjective decision-making about:

a)  Compensation, including hourly pay, salary base pay, discretionary bonuses;

b)  Hiring;

c)  Development;

d)  Advancement;

e)  Opportunities for mentor/mentee relationships;

f)  Promotions;

g)  Work assignments;

h)  Level of responsibility;

i)  Client introductions;

j)  Opportunities to socialize at company events;

k)  Opportunities to socialize at company events with clients;

l)  Internal committee appointments and/or the exclusion from such committees;

m) Demotions;

n)  Failing to prevent, address, properly investigate and/or take remedial action regarding claims of discrimination against POC employees; and

o) Terminations, including through reductions-in-force ("RIFs").

159. The subjective decision-making about the items listed above regularly involves bias and unconscious bias by the individuals at IRI that have the power and authority to render such decisions.

160. As such, the systemic discriminatory practices that disproportionately affect female employees' compensation as compared to similarly situated men at IRI include, inter alia:

a) Discretionary hiring practices that disfavor female and POC employees;

b) Discretionary compensation policies that disfavor female and POC employees;

c) Discretionary performance evaluation systems that disfavor female employees;

d) Discretionary promotion systems that disfavor female and POC employees; and

e) Discretionary termination practices that disfavor female and POC employees.

161. This discrimination is intensified and perpetuated by IRI's repeated failures regarding the ability to prevent, address, properly investigate and/or take remedial action when female employees complain about discrimination.

162. Repeatedly, IRI has failed to prevent, address, properly investigate and/or take remedial action when other employees report incidents to IRI that suggest racially motivated bias.

163. Importantly, as set forth in this Complaint, based on the inexplicable, massive disproportionate lack of representation of POC employees, male and female, at every level of IRI's hierarchy (including, but to a somewhat lesser extent, the bottom-most tiers), IRI was on notice but failed to take corrective action to remedy the horrific racial discrimination.

164. The internal statistical data that shows that female and POC employees were clearly disfavored as compared to White employees is overwhelming and has existed for years.

165.    IRI claims that it supports female and POC employees as they develop, but in reality, only those in leadership positions, predominantly White men, have the authority to make meaningful client contacts, engage in business pitches, invite potential clients or existing clients to exclusive social events.

166.    Without the same opportunities to secure substantial new business, network and maintain client relationships, as are given to White employees, primarily men, the perpetual state of lower compensation, lower levels of responsibilities, titles and roles for female and POC employees at IRI is a cruel reality.

167.    Such systemic failures allow managers and senior executives, predominantly White, to perpetuate race and gender discrimination against female and POC employees that has and continues to cause them to experience the following, inter alia:

a) Unequal hourly wages for substantially the same work as compared to male, primarily white employees;

b) Unequal base salary for substantially the same work as compared to male, primarily white employees;

c) Unequal performance evaluations as compared to male, primarily white employees;

d) Unequal bonuses for substantially the same work as compared to male, primarily white employees;

e) Unequal benefits and other forms of compensation as compared to male, primarily white employees;

f) Unequal opportunities for business development opportunities as compared to male, primarily white employees; and

g) Unequal opportunities for advancement as compared to male, primarily white employees.

168.     The above conduct resulted in subjecting female and POC employees to lesser terms and conditions of employment.

169.     Upon information and belief, IRI subjected female and POC employees at all levels to such unequal pay, including, but not limited to, consultants, principals, vice presidents, and presidents. The pay disparity as compared to men, primarily white, is especially egregious for these women and POC that occupy some of the lower paid positions at IRI.

170.     IRI's systemic discrimination against the EPA Collective is continuing in nature. The EPA Collective members were paid less and denied promotions at a greater rate by IRI than were similarly situated male employees, primarily White, despite performing similar or the same work, and having comparable or better experience and qualifications.

171.     IRI's discrimination against Plaintiffs and the EPA Collective was the result of common patterns, practices and/or policies, and acquiescence to and ratification of such patterns, practices and/or policies. The claims of Plaintiffs stated herein are essentially the same as those of the other EPA Collective members.

172.     The EPA Collective is readily ascertainable, and the names and addresses of the EPA Collective members are readily ascertainable from IRI's records and files.

173.     Common questions of law and fact predominate with respect to Plaintiffs and the EPA Collective, who worked in New York and were subject to substantially similar Company employment patterns, practice and/or policies.

**FIRST CAUSE OF ACTION**
**(Discrimination in Violation of Section 1981)**
***Against All Defendants***

174.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

175.     By the actions detailed above, among others, Defendants have discriminated against Plaintiffs in violation of Section 1981 by, inter alia, denying her the equal terms and conditions of employment because of their race and subjecting them to a hostile work environment because of their race.

176.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, for which they are entitled to an award of damages.

177.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, mental anguish and severe emotional distress, for which they are entitled to an award of damages.

178.     Defendants' unlawful and discriminatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiffs are entitled to an award of punitive damages.

**SECOND CAUSE OF ACTION**
**(Retaliation in Violation of Section 1981)**
*Against All Defendants*

179.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

180.    By the actions detailed above, among others, Defendants have retaliated against Plaintiffs based on their protected activities in violation of Section 1981, including, most recently, terminating Plaintiff Santiago's employment.

181.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiffs have suffered, and continue to suffer, monetary and/or economic harm, for which they are entitled to an award of damages.

182.    As a direct and proximate result of Defendants' unlawful and retaliatory conduct in violation of Section 1981, Plaintiff has suffered, and continues to suffer, mental anguish and severe emotional distress, for which she is entitled to an award of damages.

183.    Defendants' unlawful and retaliatory actions constitute malicious, willful and wanton violations of Section 1981, for which Plaintiff is entitled to an award of punitive damages.


### THIRD CAUSE OF ACTION
**(Race and Gender Discrimination under the NYSHRL)**
***Against All Defendants***

184.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

185.    The New York State Human Rights Law Provides that it shall be unlawful discriminatory practice:

> For an employer… because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, or marital status, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment.

186.     Defendants discriminated against Plaintiffs on the basis of their race and/or gender in violation of NYSHRL.

187.     As a direct and proximate result of Defendants unlawful discriminatory conduct in violation of the NYSHRL, Plaintiffs have suffered and continue to suffer substantial losses, including the loss of past earnings, the loss of future earnings, and the loss of other employment benefits in an amount to be proved at trial.

188.     As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental consequential damages and expenses in an amount to be proved at trial.

189.     Defendants have acted with malice or reckless indifference to the Plaintiffs.

**FOURTH CAUSE OF ACTION**
**(Hostile Work Environment under the NYSHRL)**
***Against All Defendants***

190.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

191.     The New York State Human Rights Law Provides that it shall be unlawful discriminatory practice:

> For an employer… to subject any individual to harassment because of an individual's age, race, creed, color, national origin, sexual orientation, gender identity or expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, domestic violence victim status, or because the individual has opposed any practices forbidden under this article or because the individual has filed a complaint, testified or assisted in any proceeding under this article, regardless of whether such harassment would be considered severe or pervasive under precedent applied to harassment claims. Such harassment is an unlawful discriminatory practice when it subjects an individual to inferior terms, conditions or privileges of employment because of the individual's membership in one or more of these protected categories. The

fact that such individual did not make a complaint about the harassment to such employer, licensing agency, employment agency or labor organization shall not be determinative of whether such employer… Nothing in this section shall imply that an employee must demonstrate the existence of an individual to whom the employee's treatment must be compared.

192.     Based on the foregoing, Plaintiffs were subjected to a hostile work environment on the basis of their race and/or gender in violation of the NYSHRL.

193.     As a proximate result of Defendants' harassment, Plaintiffs have suffered compensatory and other consequential damages and expenses.

194.     As a further proximate result of Defendants' actions, Plaintiffs suffered, and continue to suffer, severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to his reputation.

195.     Defendants' conduct was perpetrated with a conscious disregard of Plaintiffs' rights.

**FIFTH CAUSE OF ACTION**
**(Retaliation under the NYSHRL)**
*Against All Defendants*

196.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

197.     By the actions described above, among others, Defendants retaliated against Plaintiffs for making protected complaints regarding discrimination on the basis of race and/or gender.

198.     As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs have suffered and continue to suffer substantial losses, including

the loss of past earnings, the loss of future earnings, and the loss of other employment benefits in an amount to be proved at trial.

199.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental consequential damages and expenses in an amount to be proved at trial.

200.    Defendants have acted with malice or reckless indifference to the Plaintiffs

## SIXTH CAUSE OF ACTION
### (Aiding and Abetting Under the NYSHRL)
### *Against All Defendants*

201.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

202.    The New York State Human Rights Law provides that "[i]t shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this article, or to attempt to do so."

203.    Defendants violated the section cited herein by aiding, abetting, inciting, compelling, and coercing the above discriminatory and unlawful conduct.

204.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYSHRL, Plaintiffs have suffered and continue to suffer substantial losses, including the loss of past earnings, the loss of future earnings, and the loss of other employment benefits in an amount to be proved at trial.

205.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental consequential damages and expenses in an amount to be proved at trial.

**SEVENTH CAUSE OF ACTION**
**(Discrimination Under the NYCHRL)**
*Against All Defendants*

206.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

207.    The New York City Human Rights Law provides it shall be unlawful discriminatory practice:

> For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual orientation, uniformed service or alienage or citizenship status of any person (1) To represent that any employment or position is not available when in fact it is available; (2) To refuse to hire or employ or to bar or to discharge from employment such person; or (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment.

208.    Defendants engaged in an unlawful discriminatory practice in violation of New York City Administrative Code Title 8 §8-107(l)(a) by discriminating against Plaintiffs based upon their race and/or gender.

209.    As a result of Defendants' conduct alleged in this Complaint, Plaintiffs have suffered and continue to suffer harm, including, but not limited to, lost earnings, benefits, employment opportunities, other financial loss and non-economic damages

210.    By reason of Defendants' discrimination, Plaintiffs are entitled to all remedies available for violations of NYCHRL.

**EIGHTH CAUSE OF ACTION**
**(Hostile Work Environment Under the NYCHRL)**
*Against All Defendants*

211.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

212.    Based on the foregoing, Plaintiffs were subjected to a hostile work environment on the basis of race and/or gender.

213.    As a proximate result of Defendants' retaliation, Plaintiffs have suffered compensatory and other consequential damages and expenses.

214.    As a further proximate result of Defendants' actions, Plaintiffs suffered, and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to her reputation.

215.    Defendants' conduct was perpetrated with a conscious disregard of Plaintiffs' rights.

**NINTH CAUSE OF ACTION**
**(Retaliation Under the NYCHRL)**
*Against All Defendants*

216.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

217.    The Administrative Code of the City of New York, states that it shall be unlawful discriminatory practice for any employer to

> retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, or (v)

provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter.

218.    By the actions described above, among others, Defendants retaliated against Plaintiffs for making protected complaints regarding discrimination on the basis of race and/or gender.

219.    As a proximate result of Defendants' retaliation, Plaintiffs suffered compensatory and other consequential damages and expenses

220.    As a further proximate result of Defendants actions, Plaintiffs suffered, and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to her reputation.

221.    Defendants' conduct was perpetrated with a conscious disregard of Plaintiffs' rights.

## TENTH CAUSE OF ACTION
### (Aiding and Abetting Under NYCHRL)
*Against All Defendants*

222.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

223.    The New York City Administrative Code Title 8 §8-107(6) provides that "It shall be an unlawful discriminatory practice for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or to attempt to do so."

224.    Defendants violated the section cited herein by aiding, abetting, inciting, compelling, and coercing the above discriminatory and unlawful conduct.

225.    As a direct and proximate result of Defendants' unlawful discriminatory conduct in violation of NYCHRL, Plaintiffs have suffered and continue to suffer substantial losses, including the loss of past earnings, the loss of future earnings, and the loss of other employment benefits in an amount to be proved at trial

226.    As a direct and proximate result of Defendants' actions, Plaintiffs suffered and continue to suffer severe and lasting embarrassment, humiliation, mental and physical anguish and other incidental consequential damages and expenses in an amount to be proved at trial.

## ELEVENTH CAUSE OF ACTION
### (Employer Liability Under NYCHRL)

227.    Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

228.    The New York City Administrative Code Title 8 §8-107(13) provides

a) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of any provision of this section other than subdivisions one and two of this section.
b) An employer shall be liable for an unlawful discriminatory practice based upon the conduct of an employee or agent which is in violation of subdivision one or two of this section only where:

   1) the employee or agent exercised managerial or supervisory responsibility; or
   2) the employer knew of the employee's or agent's discriminatory conduct, and acquiesced in such conduct or failed to take immediate and appropriate corrective action; an employer shall be deemed to have knowledge of an employee's or agent's discriminatory conduct where that conduct was known by another employee or agent who exercised managerial or supervisory responsibility; or
   3) the employer should have known of the employee's or agent's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

229.    Due to the above provision, the entity Defendant is liable under the NYCHRL.

**TWELFTH CAUSE OF ACTION**
**(Violations of the Equal Pay Act)**
**(Individual and Collective Claims)**
*Against All Defendants*

230.   Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

231.   The claims brought herein under the Equal Pay Act, 29 U.S.C. § 206 et seq., are brought on behalf of Plaintiff and all members of the EPA Collective.

232.   During the period of the employment of Plaintiffs and all members of the EPA Collective, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. § 206 et seq. During that time, Defendants required Plaintiffs and the members of the EPA Collective to perform the same or substantially the same job position as male, primarily White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiffs and the members of the EPA Collective at a rate of pay, including salary and bonus, less than such male, primarily White, employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

233.   Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiffs and the members of the EPA Collective on the basis of their gender and by paying Plaintiffs and the EPA Collective members a lesser rate of pay, including salary and bonus, than that paid to male, primarily White, employees performing the same or substantially similar job duties which require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

234.     By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. § 206 et seq.

235.     As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiffs and the EPA Collective members have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

236.     Plaintiffs and the members of the EPA Collective are further entitled to liquidated damages, reasonable costs and attorneys' fees.

## THIRTEENTH CAUSE OF ACTION
### (Violations of the New York Equal Pay Law)
### *Against All Defendants*

237.     Plaintiffs hereby repeat, reiterate and re-allege each and every allegation in each of the preceding paragraphs as if fully set forth herein.

238.     During Plaintiffs' period of employment, Defendants were subject to the provisions of the New York Pay Equity Law, New York Labor Law § 194 et seq. ("New York Labor Law"). Defendants required Plaintiffs to perform the same or substantially the same job position as male, primarily White, employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishment, and paid Plaintiffs at a rate of pay, including salary and bonus, less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a bona fide factor other than gender, such as education, training, or experience.

239.     Defendants engaged in patterns, practices and/or policies of employment that discriminated against Plaintiffs on the basis of their gender by paying them a lesser rate of pay,

including salary and bonus, than that paid to male employees performing the same or substantially

similar job duties which require equal skill, effort, and responsibility, and under the same working

conditions and at the same establishment.

240.    By the actions described above, among others, Defendants have violated the New

York Labor Law.

241.    As a direct and proximate result of Defendants' unlawful and discriminatory

conduct in violation of the New York Labor Law, Plaintiffs have suffered, and continue to suffer,

harm for which they are entitled to an award of monetary damages and other relief.

242.    Plaintiffs are further entitled to liquidated damages, reasonable costs and attorneys'

fees.

### FOURTEENTH CAUSE OF ACTION
### (Discrimination Under Title VII)
### *Against Entity Defendants Only*

243.    The Plaintiffs hereby incorporate all preceding paragraphs of this complaint with

the same force and effect as if fully set forth at length.

244.    Title VII of the Civil Rights Act of 1964 provides that

It shall be an unlawful employment practice for an employer—(1) to fail or refuse
to hire or to discharge any individual, or otherwise to discriminate against any
individual with respect to his compensation, terms, conditions, or privileges of
employment, because of such individual's race, color, religion, sex, or national
origin; or (2) to limit, segregate, or classify his employees or applicants for
employment in any way which would deprive or tend to deprive any individual of
employment opportunities or otherwise adversely affect his status as an employee,
because of such individual's race, color, religion, sex, or national origin.

245.    As described above, Defendants have discriminated against the Plaintiffs due to

their race and/or gender in violation of Title VII of the Civil Rights Act of 1964.

246.    As a proximate result of Defendants' retaliation, Plaintiffs have suffered compensatory and other consequential damages and expenses.

247.    As a further proximate result of Defendants' actions, Plaintiffs suffered, and continue to suffer, severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to her reputation.

248.    Defendants' conduct was perpetrated with a conscious disregard of Plaintiffs' rights.

## FIFTEENTH CAUSE OF ACTION
### (Hostile Work Environment Under Title VII)
### *Against Entity Defendants Only*

249.    The Plaintiffs hereby incorporate all preceding paragraphs of this complaint with the same force and effect as if fully set forth at length.

250.    Title VII of the Civil Rights Act of 1964 provides that

It shall be an unlawful employment practice for an employer—(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

251.    As described above, Defendants have discriminated against the Plaintiffs due to their race and/or gender by subjecting them to a hostile work environment in violation of Title VII of the Civil Rights Act of 1964.

252.    As a proximate result of Defendants' retaliation, Plaintiffs have suffered compensatory and other consequential damages and expenses.

253.    As a further proximate result of Defendants' actions, Plaintiffs suffered, and continue to suffer, severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to her reputation.

254.    Defendants' conduct was perpetrated with a conscious disregard of Plaintiffs' rights.

## SIXTEENTH CAUSE OF ACTION
### (Retaliation Under Title VII)
### *Against Entity Defendants Only*

255.    Plaintiffs repeat, reiterate and reassert all allegations contained in the preceding paragraphs of this complaint as if fully set forth herein at length.

256.    Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e-3(a) provides that it shall be unlawful to "discriminat[e] against any of his employees… because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted or participated in any manner in an investigation, proceeding, or hearing under this subchapter"

257.    Plaintiffs reported and complained of Defendants discriminatory conduct.

258.    Defendants retaliated against the Plaintiffs for reporting Defendants' discriminatory conduct.

259.    Based on the foregoing, Defendants retaliated against the Plaintiffs for engaging in protected activity.

260.    As a proximate result of Defendants' retaliation, Plaintiffs have suffered compensatory and other consequential damages and expenses.

261.    As a further proximate result of Defendants actions, Plaintiffs suffered, and continue to suffer, severe and lasting embarrassment, humiliation, mental and physical anguish, and damage to her reputation.

262.    Defendants' conduct was perpetrated with a conscious disregard of Plaintiff's rights.

## JURY DEMAND

263.    Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, the Plaintiffs hereby demand a trial by jury with respect to all issues so triable

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the EPA Collective, pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

a) A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States, the State of New York and the City of New York;

b) An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

c) An order directing Defendants to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices are eliminated;

d) Designate this action as a collective action on behalf of the proposed EPA Collective Plaintiffs (asserting EPA claims) and

   a. promptly issuing notice pursuant to 29 U.S.C. § 216(b) to all similarly situated members of the EPA Collective, which (a) apprises them of the pendency of this action, and (b) permits them to assert timely EPA claims in this action by filing individual Consent to Sue forms pursuant to 29 U.S.C. § 216(b); and

   b. tolling the statute of limitations on the claims of all members of the EPA Collective from the date the original complaint was filed until the Collective members are provided with reasonable notice of the pendency of this action and a fair opportunity to exercise their right to opt in as Plaintiffs;

e) Designate the Named Plaintiffs as representatives of the EPA Collective;

f) An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the EPA Collective for all monetary and/or economic damages;

g) An award of damages against Defendants, or any jointly or severally liable entity or person, in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and the EPA Collective for all non-monetary and/or compensatory damages;

h) An award of liquidated damages;

i) An award of punitive damages;

j) Prejudgment interest on all amounts due;

k)   An award of costs that Plaintiffs and the EPA Collective incur in this action, as well as

an award of reasonable attorneys' fees to the fullest extent permitted by law; and

l)   Such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
          June 4, 2021

Respectfully submitted,
LAW OFFICES OF WILLIAM CAFARO

_____

By: Amit Kumar, Esq. (AK 0822)
*Attorneys for Plaintiffs*
108 West 39th Street, Ste. 602
New York, New York 10018
(212) 583-7400
AKumar@CafaroEsq.com